1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7

8    MASAYUKI AGURO,

9              Petitioner,                    No. C 05-5296 PJH

10                                            **ORDER DENYING PETITION**
                                              **FOR WRIT OF HABEAS CORPUS**
11        v.

12   JEANNE S. WOODFORD, Director,
     California Dept. Of Corrections,
13
               Respondent.
14   _____/

15        Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §

16   2254, filed by state prisoner, Masayuki Aguro ("Aguro").  Having reviewed the parties'

17   papers, the record, and having carefully considered their arguments and the relevant legal

18   authorities, the court hereby DENIES the petition.

19                              **BACKGROUND**

20   **I.    Procedural Background**

21        On February 2, 1999, the state filed a complaint charging Aguro with two counts of

22   continuous sexual abuse of a child under California Penal Code § 288.5(a).  The state

23   subsequently filed an amended information on June 20, 2002, charging, in the alternative,

24   thirteen counts of lewd and lascivious conduct on a child under fourteen under § 288(a).

25        Aguro waived his right to a jury trial and submitted the case for decision by the trial

26   judge pursuant to *Bunnell v. Superior Court*, 13 Cal.3d 592 (Cal. 1975).[1]  On September 4,

27   _____

28        [1]Under this procedure, sometimes referred to as a "slow plea," the defendant enters a
     plea of not guilty, after which the case is submitted to the judge for decision upon stipulated
     facts, while reserving his right to appeal.  *See People v. Sanchez*, 12 Cal.4th 1, 27-30 (Cal.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   2002, the Santa Clara County judge found Aguro guilty of thirteen counts of lewd and

2   lascivious conduct on a child under fourteen pursuant to California Penal Code § 288(a),

3   and acquitted him of the two resident child molester counts under California Penal Code §

4   288.5(a).  On December 12, 2002, the trial judge sentenced Aguro to twenty-six years in

5   prison.  Aguro unsuccessfully appealed his conviction to the California Court of Appeal, and

6   the California Supreme Court subsequently denied review on April 16, 2004.

7         Aguro then sought habeas relief with the California Supreme Court on July 5, 2005.

8   While his state habeas petition was pending, Aguro filed the instant petition for federal

9   habeas relief with this court on December 21, 2005.  On April 5, 2006, the court granted

10  Aguro's request to stay the instant proceedings pending exhaustion of the unexhausted

11  claims before the state court.  The California Supreme Court denied Aguro's request for

12  state habeas relief on August 16, 2006.

13  **II.    Factual Background**

14        On numerous occasions between July 1998 and January 1999, Aguro and his wife

15  babysat the victims, seven year-old Alisa Doe and five year-old Sara Doe, who were

16  sisters.  In January 1999, the victims told their mother about lewd acts committed by Aguro

17  when they were left alone with him.  Subsequently, Aguro admitted to police investigators in

18  an audiotaped statement that he had forced both Sara and Alisa to touch his penis, that he

19  put his penis between both victims' legs, that he touched his penis to both victims' mouths,

20  and that he digitally penetrated Sara.

21        Following his release on bail on February 3, 1999, Aguro, a Japanese citizen, fled to

22  Japan.  He was subsequently extradited back to the United States on August 10, 2002.

23  Aguro's case was originally to be tried to a jury in the Santa Clara County Superior Court.

24  At the commencement of the jury trial, Aguro moved to suppress his pretrial confession.

25  Following an evidentiary hearing at which Aguro and the investigating officers testifed, the

26  court denied Aguro's motion to suppress.

27  _____

28  1995).

2

United States District Court

For the Northern District of California

Both counsel then gave their opening statements.  However, following opening statements, Aguro decided not to proceed with a jury trial and instead indicated his desire to enter a *Bunnell* plea.  The court then engaged in a colloquy with Aguro regarding the rights that he was waiving, and found that Aguro knowingly and voluntarily waived his constitutional rights, including his right to a jury trial.  The court subsequently found him guilty of the thirteen counts of lewd and lascivious conduct on a child under fourteen under § 288(a).

## ISSUES

Aguro raises the following seven claims for relief in his federal habeas petition, which include five sub-claims that he was denied effective assistance of counsel:

(1) that his conviction and sentence violated the extradition treaty between the United States and Japan;

(2) that he was denied his Fifth Amendment rights because he was never advised of his *Miranda* rights prior to giving a confession;

(3) that his confession was obtained outside the presence of a lawyer despite his repeated requests for a lawyer, in violation of his Fifth Amendment rights;

(4) that his confession was involuntary and coerced in violation of the Fifth Amendment;

(5) that his Sixth Amendment rights were violated when the prosecution failed to provide exculpatory evidence;

(6) that his Fifth, Sixth, and Fourteenth Amendment rights were violated because his waiver of rights was not knowing, intelligent, and/or voluntary; and

(7) that he was denied due process and effective assistance of counsel when his trial counsel:

(a) induced him to waive his constitutional rights by entering into a *Bunnell* plea;

(b) failed to raise as error on appeal the trial court's admission of his confession, which was procured in violation of his Fifth Amendment rights;

(c) failed to litigate the prosecution's failure to produce the original tape recording of petitioner's confession;

(d) failed to adequately investigate and present evidence that the victims' testimony was false and the product of undue influence; and

(e) failed to allow petitioner to testify on his own behalf at trial;

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court authority, falling within the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of [Supreme] Court decisions as of the time of the relevant state court decision."  *Id.*

"Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  However, this standard "requires the state court decision to be more

4

than incorrect or erroneous." *Id.*  For the federal court to grant habeas relief, the state

court's application of the Supreme Court authority must be "objectively unreasonable." *Id.*

The "objectively unreasonable" standard is different from the "clear error" standard in that

"the gloss of clear error fails to give proper deference to state courts by conflating error

(even clear error) with unreasonableness." *Id.*; *see also Clark v. Murphy*, 331 F.3d 1062,

1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas court, in its independent

review of the legal question, is left with a firm conviction that the state court was erroneous

. . . Rather, the habeas court must conclude that the state court's application of federal law

was objectively unreasonable." *Andrade*, 538 U.S. at 75; *see also Clark*, 331 F.3d at 1068.

As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

state court resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

determining the "unreasonable determination of facts in light of the evidence" under §

2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

determination made by the state court was wrong and that the one [petitioner] urges was

correct." *Id.* at 1108.

However, when the state court decision does not articulate the rationale for its

determination or does not analyze the claim under *federal* constitutional law, a review of

that court's application of clearly established federal law is not possible.  *See Delgado v.

Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, Federal

Habeas Corpus Practice and Procedure § 32.2, at 1424-1426 & nn. 7-10 (4th ed. 2001).

When confronted with such a decision, a federal court must conduct an independent review

of the record and the relevant federal law to determine whether the state court's decision

1   was "contrary to, or involved an unreasonable application of, "clearly established federal

2   law." *Delgado*, 223 F.3d at 982.

> When a state court does not furnish a basis for its reasoning, we have no
> basis other than the record for knowing whether the state court correctly
> identified the governing legal principle or was extending the principle into a
> new context. . . .[A]lthough we cannot undertake our review by analyzing the
> basis for the state court's decision, we can view it through the 'objectively
> reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
> review is not de novo when the state court does not supply reasoning for its
> decision, but an independent review of the record is required to determine
> whether the state court clearly erred in its application of controlling federal
> law. . . . Only by that examination may we determine whether the state
> court's decision was objectively reasonable.

9   *Id.*

10                                          **DISCUSSION**

11          Aguro raised only the first issue in his direct appeal before the state courts, and only

12   that issue was addressed by the state courts in a written, reasoned decision.  Aguro raised

13   the other six issues, including the five sub-claims of ineffective assistance of counsel, only

14   in his habeas petition before the California Supreme Court.  Because that court issued only

15   a postcard denial of Aguro's habeas petition, there is no written, reasoned state court

16   decision on any of those issues.  Accordingly, this court has conducted an independent

17   review of the record and the relevant federal law in determining whether the state court's

18   decision on those issues was "contrary to, or involved an unreasonable application of,

19   clearly established federal law." *Id.*

20   **I.      Aguro's Conviction and Sentence do not Violate the Extradition Treaty**

21          As noted, following Aguro's release on bail, he fled to Japan.  On May 16, 2001, the

22   United States requested Aguro's extradition pursuant to the extradition treaty between

23   Japan and the United States.  Clerks Transcripts ("C.T.") 289-324.  In its request to

24   extradite Aguro, the United States Embassy noted that Aguro was charged with two counts

25   of continuous sexual abuse of a child under fourteen under California Penal Code §

26   288.5(a).  C.T. 311.  It further noted that "[u]nder California law, the maximum sentence

27   that may be imposed for the above offenses is sixteen years imprisonment."  C.T. 311.

28

United States District Court

For the Northern District of California

The Embassy concluded that it "has the honor to assure the [Japanese] Ministry that Aguro will not be detained, prosecuted, tried or punished except for the offense for which this request for extradition is made, other than in accordance with Article VII of the Treaty. . . ." C.T. 312.

The request for extradition also included a declaration from Lane Liroff, the deputy district attorney for Santa Clara County.  In his declaration, Liroff attested that

> [p]ursuant to California criminal law, if convicted the defendant will be sentenced to either six, twelve or sixteen years.  The sentencing court will exercise its discretion in determining whether the crime, and the defendant's history, are mitigated or aggravated.  If the court concludes that there is neither mitigating or aggravating evidence available then it will impose the middle term of twelve years.

C.T. 318.

Aguro was extradited back to the United States on August 10, 2002.  Following Aguro's extradition, the state amended the information to allege, in the alternative to the two resident child molester counts under § 288.5, thirteen counts of lewd and lascivious conduct on a child under fourteen pursuant to California Penal Code § 288(a).

As noted, following the opening statements at the commencement of his jury trial, Aguro moved for a mistrial, which the court granted, and entered a *Bunnell* plea.  In taking Aguro's plea, the court inquired regarding the parties' agreements as to Aguro's sentence, and the following colloquy took place:

> The Court: I'm not sure whether you stated whether there is a bottom on this.
>
> Mr. Kennedy [defense counsel]: I did not.  Thank you for reminding me your honor.  The promise made to Mr. Aguro is that the court would impose a sentence of no more than 32 years and no less than 16 years.
>
> The Court: That's my understanding.  Is that your understanding of what's going to happen right now Mr. Aguro?
>
> The Defendant: Yes, your honor.
>
> . . . .
>
> The Court: Now, in return for your waiver giving up certain rights, the indicated sentence if you are convicted of these charges or some of these charges would be between 16 years and 32 years.  Is that your understanding?

1    The Defendant: Yes, your honor.

2    The Court: Have there been any other promises made to you?

3    The Defendant: No, your honor.

4    The Court: Have there been any threats made to you?

5    The Defendant: No, your honor.

6    The Court: Is your decision to give up the rights I'm about to ask you about
     being made free and voluntary, freely and voluntarily because this is what you
7    want to do?

8    The Defendant: Yes, your honor.

9    The Court: I will advise you if you are not a U.S. citizen, if you are convicted,
     you will be subject to deportation, exclusion from the United States or denial
10   of naturalization.  Do you understand this?

11   Defendant: Yes, your honor.

12   The Court: Now, under the agreement you would not be granted probation if
     you are convicted.  Your sentence would be state prison somewhere between
13   16 years to 32 years.

14   R.T. 100-103.  After numerous other advisements and inquiries, the court found that Aguro

15   was entering his *Bunnell* plea voluntarily, and accepted the plea.  As noted, the court then

16   found Aguro guilty of the thirteen counts of lewd and lascivious conduct on a child under

17   fourteen pursuant to California Penal Code § 288(a), but acquitted him of the two resident

18   child molester counts under § 288.5.

19        Prior to sentencing, Aguro moved the trial court to limit his maximum sentence to

20   sixteen years, arguing that was the maximum sentence allowed by the extradition request.

21   C.T. 285-288; 340-42.  The prosecution countered that the extradition treaty would not be

22   violated by a sentence of greater than sixteen years because under the doctrine of

23   specialty, the treaty limited the charges that may be filed, but not the sentence that could

24   be imposed; that there was no evidence that the Japanese government imposed any

25   sentencing conditions on the extradition of Aguro; that the documents accompanying the

26   request for Aguro's extradition were ambiguous regarding the maximum sentence; and that

27   Aguro consented to the imposition of a sentence of up to 32 years pursuant to his *Bunnell*

28

8

United States District Court

For the Northern District of California

1    plea.  Following the parties' arguments, the trial court denied Aguro's motion and

2    sentenced him to twenty-six years imprisonment.  R.T. 150-52; 156-67.

3         Aguro then appealed the issue to the state appellate courts.  In a written decision,

4    the California Court of Appeal affirmed Aguro's conviction and rejected his arguments

5    regarding the extradition treaty.  It held that there was no violation of the extradition

6    agreement because the request's "language pertaining to defendant's possible punishment

7    was not couched as a condition of the agreement but as context[] for the offenses sought to

8    be prosecuted."  Additionally, the court found that the treaty allowed for prosecution for

9    offenses other than those specified as long as they were based on the same operative

10   facts, and therefore that it "must logically allow for the punishment attendant to such

11   different offenses."  Alternatively, the court found that Aguro waived reliance on any treaty-

12   based 16-year maximum sentence in exchange for a court trial.

13        **A.    Legal Standards**

14        In *United States v. Rauscher,* 119 U.S. 407 (1886), and *Johnson v. Browne,* 205

15   U.S. 309 (1907), the Supreme Court set forth principles for interpreting extradition treaties

16   and analyzed the effect of limitations on what offenses may be punished by the extraditing

17   country.  In *Rauscher*, the Supreme Court established the doctrine of specialty, which

18   provides that an extradited defendant may not be prosecuted "for any offense other than

19   that for which the surrendering country agreed to extradite." *United States v. Andonian,* 29

20   F.3d 1432, 1434-35 (9th Cir. 1994) (citing *Rauscher*, 119 U.S. at 412) (holding that

21   defendant extradited from Great Britain for the crime of murder could not be prosecuted for

22   assault); *see also Browne*, 205 U.S. at 309 (defendant could not be convicted in the United

23   States for conspiracy to defraud the government where it was contrary to the agreed-upon

24   terms of extradition and to the relevant treaty language).  The doctrine of specialty is based

25   on principles of international comity.  *United States v. Cuevas,* 847 F.2d 1417, 1426 (9th

26   Cir. 1988).  To protect its own citizens in prosecutions abroad, the United States

27   guarantees that it will honor limitations placed on prosecutions in the United States.  *Id*.  Its

28

**United States District Court**
For the Northern District of California

concern is with ensuring that the obligations of the requesting nation are satisfied. *United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir. 1986). "Because of this, the protection exists only to the extent that the surrendering country wishes." *Id.*

An extradited person may raise whatever objections the extraditing country is entitled to raise. *Cuevas,* 847 F.2d at 1426; *Najohn,* 785 F.2d at 1422.  The court looks to the language of the applicable treaty to determine the protection an extradited person is afforded under the doctrine of specialty. *Andonian*, 29 F.3d at 1434-1435.  The appropriate test is "whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited." *Cuevas,* 847 F.2d at 1428 (citing *United States v. Paroutian,* 299 F.2d 486, 491 (2d Cir. 1962)).

A defendant may be tried on charges not specified in the extradition request as long as the charges are not considered separate offenses and are based on the same operative facts. *See Andonian* 29 F.3d at 1435 -1436; *Cuevas,* 847 F.2d at 1426.  For example, in *Andonian*, the Ninth Circuit held that the defendant could be tried and convicted based on offenses alleged in a superseding indictment returned after his extradition because the offenses did not constitute "separate offenses" as that term is used in the context of the doctrine of specialty.  29 F.3d at 1435-1436.  The court rejected the defendant's argument that his conviction violated the doctrine of specialty because the indictment that formed the basis for the extradition had contained fewer counts, concluding that "[t]he superseding indictment altered neither the nature of the scheme alleged nor the particular offenses alleged."  *Id.* at 1437 (finding that prosecution for additional counts of money laundering was not outside the scope of a Uruguayan court's extradition order).  In so holding, the *Andonian* court noted with approval that "in the absence of any affirmative protest from [the surrendering country], we do not believe that Government would regard the prosecution of [defendants] for subsequent offenses of the same character as the crime for which they were extradited as a breach of faith by the United States." *Id.* at 1436 (quoting *Fiocconi v. Attorney General,* 462 F.2d 475, 481 (2d Cir. 1972)).

United States District Court

For the Northern District of California

**B.    Analysis**

In his pro se habeas petition filed with this court, Aguro initially appeared to attempt to enlarge the instant claim from that raised in state court.  Aguro argued that his conviction violated the treaty because he was sentenced for offenses that were different than those specified in the extradition request, *and* because his sentence exceeded the sixteen years specified in the request.  However, Aguro raised only the latter issue before the state courts, and, in fact, previously conceded that he could be charged with and convicted of the thirteen violations under § 288(a) as an alternative to conviction as a resident child molester under § 288.5 because the charges all arose "from the same operative facts as those described in the extradition request."  C.T. 328 (citing *Andonian*, 29 F.3d at 1432).  Following the filing of his pro se habeas petition, Aguro retained counsel and did not address or supplement in his reply brief the offense-related argument contained in his opening pro se petition.

The court finds that Aguro has abandoned the argument that his conviction violated the treaty because he was sentenced for offenses other than those specified in the extradition request, by conceding it before the state courts below.  Nevertheless, the court finds that the argument is without merit because the treaty here specifically allows for prosecution for other charges as long as those charges are predicated "upon the basic facts which constitute the offense for which extradition has been granted."  C.T. 294; *see also Andonian*, 29 F.3d at 1435 -1436; *Cuevas,* 847 F.2d at 1426.  There is no dispute that Aguro's conviction on the thirteen counts of lewd and lascivious conduct on a child under fourteen under § 288(a), were based on the very same facts set forth in the extradition request.

Turning to Aguro's argument that his sixteen-year sentence violated the extradition request in this case, the court finds that it is foreclosed by the Ninth Circuit's recent decision in *Benitez v. Garcia.*  495 F.3d 640, 643-644 (9th Cir. 2007).  In *Benitez*, the defendant was charged with a murder that took place in San Diego, California.  Following

United States District Court

For the Northern District of California

1   the murder, Benitez fled to Venezuela.  The United States requested extradition pursuant to

2   the United States-Venezuela extradition treaty.  That treaty provided that Venezuela

3   reserved the right to decline extradition for crimes punishable by death and life

4   imprisonment, absent "satisfactory assurances" from the requesting party that such

5   punishments will not be inflicted.  *Id.* at 642.

6        After receiving the request to extradite the *Benitez* defendant, the Venezuelan

7   government contacted the United States Embassy for information regarding his potential

8   sentence.  The United States Embassy responded that "under California law if convicted of

9   murder, and if murder in the first degree is found, Cristobal Rodriguez Benitez would

10   receive a sentence of incarceration of 25 years to life."  *Id.*  Based on a ruling from the

11   Supreme Court of Venezuela, the Venezuelan Ministry of Foreign Affairs communicated to

12   the United States that the defendant would be extradited "conditioned [on] the

13   understanding that [Benitez] will not be sentenced to life in prison or incarceration for more

14   than thirty years."  *Id.*

15        Following the defendant's extradition, the district attorney filed an information

16   alleging that the defendant committed murder and personally used a firearm in the process.

17   The Venezuelan Embassy subsequently wrote to the United States Department of Justice,

18   reasserting its concerns that the sentence faced by the defendant might violate the

19   extradition treaty and the conditions for extradition agreed upon in the case.  The defendant

20   also raised the issue without any success before the state trial court.  Following his

21   conviction after trial, the San Diego County Superior Court sentenced the defendant to an

22   indeterminate sentence of fifteen years to life with an enhancement for the personal use of

23   a firearm.  *Id.*  The defendant then argued that his indeterminate life sentence violated the

24   treaty and extradition agreements in both state and federal habeas proceedings, and the

25   courts denied relief.  *Id.*

26        The Ninth Circuit subsequently affirmed the district court's denial of habeas relief,

27   holding that the defendant was unable to establish that the state court's decision upholding

28

United States District Court
For the Northern District of California

his sentence was an objectively unreasonable application of the Supreme Court's decisions in *Rauscher* and *Browne*.  The court reasoned that although "[a]greed-upon sentencing limitations are generally enforceable," that was not what had occurred in the case.  *Id.* at 644.  Instead, the court concluded that Venezuela had attempted "unilaterally to limit Benitez's sentence."  *Id.*  In support, it found that "Venezuela could have refused extradition of Benitez until the United States [explicitly] agreed to the sentencing limitation," but that "[i]nstead, Venezuela relinquished custody."  *Id.*

Accordingly, the Ninth Circuit distinguished the case from the Supreme Court's decisions in *Rauscher* and *Browne*, which it held interpreted "negotiated agreements to extradite, not unilaterally imposed conditions."  *Id.*  The court found that there was no Supreme Court decision addressing the issue of unilaterally-imposed sentencing conditions, and that, therefore, "[t]he state court's decision was not contrary to clearly established federal law since to decide otherwise would . . . require[] an extension of the specialty doctrine."  *Id.*[2]

---

[2]The opinion discussed above actually constituted the third decision by the Ninth Circuit panel in the *Benitez* case.  The panel issued two prior opinions on March 23, 2006, and February 8, 2007, that it subsequently withdrew prior to entering the opinion now in effect, both of which reversed the district court's decision and granted habeas relief.  *See* 449 F.3d 971 (9th Cir. 2006); 476 F.3d 676 (9th Cir. 2007).  In its first decision issued March 23, 2006, the court held that under *Rauscher*, it could "enforce limitations on punishments following the extradition of a defendant, but . . . *only if the contracting treaty nations agreed* to such a limitation in the particular case."  449 F.3d at 976.  Contrary to the decision currently in effect, the court then found that the treaty nations negotiated a clear limitation on the punishment that the defendant could face.  *Id.*  The court pointed to communications from the Venezuelan Ministry of Justice, the Venezuelan Ministry of Foreign Affairs, and the Venezuelan Supreme Court, in addition to the extradition decree itself.  It thus concluded that the state court's decision otherwise was rebutted by clear and convincing evidence.  *Id.*  Because the court found "that clearly established federal law applie[d] to the punishments extradited defendants can receive when conditionally extradited under a treaty, and the facts of [*Benitez*] indicate[d] that such limitations were intended [there]," the court reversed the district court's decision and granted habeas relief.

Subsequently, the state filed a petition for rehearing.  On January 22, 2007, the panel withdrew its March 23, 2006 opinion, and replaced it with a substitute opinion.  It denied the petition for rehearing as moot.  The January 22, 2007 opinion, as amended on February 8, 2007, also reversed the district court and granted habeas relief, but altered the analysis somewhat from that of the March 23, 2006 opinion.  In the second opinion, the panel held that it was clearly established Supreme Court law under *Rauscher* and *Browne* that the extraditing

United States District Court

For the Northern District of California

1    The Japanese-United States extradition treaty at issue here does not expressly

2    forbid the twenty-six year sentence Aguro received for conviction on the thirteen counts

3    contained in the amended information.  In fact, as noted, Article VII of the treaty allows for

4    Aguro's prosecution on the amended charges so long as they were "instituted upon the

5    basic facts which constitute the offense for which extradition has been granted."  C.T. 293-

6    94.  Given this language and the fact that the treaty is silent regarding the sentence to be

7    imposed, the court cannot conclude that the sentence violated the treaty itself.

8    Additionally, like *Benitez*, there is no evidence of a "negotiated agreement" to

9    extradite Aguro based on the sentencing representations contained in the Embassy's

10    request for extradition and in Liroff's accompanying declaration.  Moreover, unlike *Benitez*,

11    there is no evidence in this case of a "unilateral" request by the Japanese government,

12    conditioning extradition on the sentencing information provided in the Embassy's request or

13    in Liroff's declaration, let alone a negotiated agreement.  In fact, there simply is no

14    evidence that the Japanese government evinced *any* sentencing desires or conditions with

15    respect to Aguro's extradition.  Accordingly, for the same reasons as those stated by the

16    Ninth Circuit in *Benitez*, this court must conclude that there is simply no clearly established

17    law addressing whether or not the United States government is bound by sentencing

18    representations made in documents accompanying an extradition request.

19    Additionally, the court concludes that in entering his *Bunnell* plea, Aguro consented

20

21    _____

22    country's expectations regarding punishment limitations must be respected if they are within
the country's rights under the extradition treaty.  476 F.3d at 681.  The court, however, noted

23    that it was "wary . . . of enforcing extradition conditions that are neither expressly agreed to by
both countries nor contemplated by the relevant extradition treaty."  *Id.* at 682.  Because the

24    court found that Venezuela "clearly believed" that it was extraditing the defendant on the
condition that he not receive a life a sentence, it held that his indeterminate life sentence was

25    the result of an objectively unreasonable decision by the California courts.  *Id.*

26    The state filed another petition for rehearing and for rehearing en banc following the
panel's second decision.  On July 16, 2007, the panel withdrew its second February 8, 2007

27    order, and substituted it with the third and final opinion discussed above.  It denied the second
petition for rehearing as moot.  The defendant and petitioner, Benitez, then filed a petition for

28    rehearing and for rehearing en banc, which the Ninth Circuit denied on October 10, 2007.

United States District Court

For the Northern District of California

1  to the sentence he received, and thus waived any objection that his sentence violated the

2  extradition treaty.  *See Haring v. Prosise*, 462 U.S. 306, 319-20 (1983) (guilty plea

3  forecloses consideration of pre-plea constitutional deprivations); *Tollett v. Henderson*, 411

4  U.S. 258, 266-67 (1973) (same)*; see also United States v. Reyes-Platero*, 224 F.3d 1112,

5  1115 (9th Cir. 2000)  (defendant waived treaty-related claims by entering guilty plea)

6  *overruled on other grounds by United States v. Castillo*, 496 F.3d 947 (9th Cir. 2007).

7  Here, the treaty itself even recognizes that the defendant may waive the punishment

8  specified by the extradition treaty or agreement "[w]hen [he] has consented to his

9  detention, prosecution, trial, or punishment for an offense other than that for which

10  extradition has been granted or to his extradition to a third State."  C.T. 293.

11      For these reasons, the state court's decision affirming Aguro's conviction and

12  sentence was not contrary to clearly established law; nor was it based on an unreasonable

13  determination of the facts in light of the evidence presented in the state court proceeding.

14  **II.     Aguro's Confession was not Obtained in Violation of his Constitutional Rights**

15      **A.     Background**

16

17      Aguro raises three claims pertaining to his confession and related admissions made

18  to police officers on January 29, 1999.

19      On January 29, 1999, during the investigation of the case and after interviewing the

20  victims, Sunnyvale police investigators, Detectives Mark Sole and David Pitts, went to

21  Aguro's home.  Aguro answered the door, and the detectives identified themselves and told

22  him that they would like to discuss an incident with him.  Aguro invited the detectives into

23  his house, and, according to the detectives, immediately volunteered "I know why you're

24  here, I molested two girls."  R.T. 34, 35, 55.  The detectives asked Aguro if he could come

25  down to the police station, to which Aguro replied that he could not because his wife was

26  not home to take care of his children.  The detectives then followed Aguro, who continued

27  to speak to them, to the kitchen area of his house.  At that point, the detectives did not

28

advise Aguro that he was under arrest, nor did they advise him of his *Miranda* rights.  The

detectives then continued to speak with Aguro for approximately twenty to thirty minutes,

and Detective Sole visibly displayed an audiorecorder, which he turned on in front of Aguro.

C.T. 236-261.

During that interview, Aguro told the detectives that the victims' father came to his

house the night before, confronted him, and beat him up.  R.T. 37.  Aguro admitted to the

officers that he molested the victims.  He specifically admitted that he made Alisa touch his

penis, that he put his penis between Alisa's legs, and that he touched his penis to Alisa's

mouth.  C.T. 241-42; 246-48.  Aguro also admitted that he touched Sara on her genitals

over her underwear; that he put his penis between Sara's legs; that he digitally penetrated

Sara; and that he touched his penis to Sara's mouth.  C.T. 243, 244-45, 249.  The

detectives subsequently arrested Aguro and advised him of his *Miranda* rights.

Prior to the commencement of his jury trial, Aguro moved to suppress his statements

to the detectives, arguing that the interrogation violated his Fifth and Sixth Amendment

rights because: (1) he was in police custody at the time, and was not advised of his

*Miranda* rights; (2) he requested to speak with an attorney prior the interrogation, but was

not allowed to do so; and (3) that his confession was involuntary and coerced based on the

number of officers and the fact that he was alone in the house with his children at the time

and believed that they would "be taken away" if he did not speak with the officers. The trial

court held an evidentiary hearing on Aguro's motion to suppress, at which both Detectives

Sole and Pitt testified, along with Aguro.  The court also considered an audiotape and

transcript of Aguro's confession.

Aguro testified with the assistance of a Japanese interpreter at the suppression

hearing.[3]  He testified that the detectives spoke to him in English, and that he did not

_____

[3]Aguro went back and forth between English and Japanese at the hearing.  At times, he responded in English to counsel's questions, posed to him in English, without the assistance of the interpreter.

United States District Court

For the Northern District of California

1    understand their questions regarding whether or not he knew why they were at his house.

2    Nevertheless, Aguro testified that he invited the detectives into his house.  However, he

3    claimed that the detectives did not identify themselves as police officers, and that he was

4    not certain of their identity.  Aguro also asserted that the officers asked him to call his wife

5    and have her return so that he could come down and talk to them at the station, to which

6    Aguro claimed he responded that he would report to the station as soon as he contacted

7    his lawyer.

8         According to Aguro, the officers then decided to conduct the interview at his house,

9    and asked him if they could go into the kitchen.  Aguro claimed that he did not feel free to

10   leave at this point because he was home alone with his children.  Once in the kitchen,

11   Detective Sole asked Aguro to tell them "his story."  Aguro claimed that he responded, "I

12   need a lawyer."  R.T. 65.  The officers failed to respond, and then a few seconds later

13   again asked Aguro to tell them his story.  Based on the officers' failure to respond to his

14   request for counsel, Aguro believed that they did not understand his English, and claimed

15   that he again stated that he needed a lawyer.  Again, the officers did not respond, and

16   Aguro finally asked them who sent them to his house.  Officer Sole then gave Aguro a

17   business card, which Aguro testified contained a "department of public safety" title.

18        Aguro also testified that he believed that the officers were private detectives for the

19   victims' father, who he claimed had threatened to send someone over to his house and

20   harm him and/or his children.  He further suggested that he believed that was the case

21   when he was answering the detectives' questions, and asserted that he lied in admitting to

22   the molestations because he believed that was what the victims' father would have wanted

23   to hear.  R.T. 74-75.  However, Aguro then retracted this testimony, and admitted that he

24   did indeed believe the detectives were police officers - as opposed to private detectives.

25   R.T. 75-76.

26        On cross-examination, Aguro testified that he told the officers that he needed a

27   lawyer because he needed help with interpretation.

28

United States District Court

For the Northern District of California

1
2
3
4
5
6

Contrary to Aguro, Detective Sole testified that although he and Detective Pitts were in plainclothes on the day they went to Aguro's house, Sole immediately identified himself as a police officer.  R.T. 34.  Sole testified that the purpose of the visit was to interview Aguro regarding the alleged molestations.  He added, though, that he never told Aguro the purpose of the visit, and that Aguro volunteered on his own that he was aware why the officers were at his house.

7
8
9
10
11

Sole testified that Aguro never asked to speak with a lawyer.  R.T. 77.  According to both Sole and Pitts, Aguro began discussing the molestations voluntarily and spontaneously.  It was at that point that Sole turned on his recorder, and showed Aguro that he was doing so.  It was not until after Aguro's confession that police officers arrested him.

12
13
14
15
16
17
18
19
20
21

The state trial court denied Aguro's motion to suppress, and found his testimony lacking in credibility.  It noted that at one point, Aguro stated that he did not know who the detectives were, but that he subsequently admitted that he thought they were the police.  R.T. 81.    The court further noted that if Aguro believed that the detectives were actually men sent by the victims' father to do him harm, as he testified at one point that he did, then it could not understand why Aguro would unlock the door and invite them in without confirming their identities.  R.T. 82.  The court also noted that Aguro's testimony that he asked for a lawyer was inconsistent with his testimony that he believed the officers were private detectives for the victims' family.  *Id.*

22
23
24
25
26
27

In conclusion, the court found the officers' testimony to be the most credible.  It found that Aguro began talking to the officers voluntarily, and that the officers did not coerce Aguro.  It further concluded that at the time that Aguro began talking to the officers, there was no requirement that *Miranda* admonishments be given, rejecting Aguro's arguments that he was in custody at the time.  Finally, the court found that Aguro did not request an attorney.

28

United States District Court

For the Northern District of California

1    As noted, the California Supreme Court denied Aguro's confession-related claims

2  with a postcard denial.  This court nevertheless treats Aguro's claims as having been

3  denied on the merits, and is required to presume that the California Supreme Court

4  affirmed the state trial court's ruling on Aguro's motion to suppress on the merits.  *See*

5  *Larue v. McCarthy,* 833 F.2d 140, 143 (9th Cir. 1987) (California Supreme Court's postcard

6  denials are considered adjudications on the merits).

7    **B.    *Miranda* Claim**

8    Aguro argues that he was denied his Fifth Amendment rights because he was never

9  advised of his *Miranda* rights prior to giving a confession.  He contends that he was in

10  custody when he was confronted by Detectives Sole and Pitts.  Aguro also now asserts,

11  contrary to the record, that he asked the officers to leave his home, but that they refused.

12  He further claims that he did not feel free to leave given that he had two small children at

13  home, and notes that the officers refused to acknowledge his requests for an attorney.

14  Aguro argues that the state trial court's credibility findings and custody determination were

15  unreasonable because the transcript of the suppression hearing is "absolutely clear" that

16  Aguro believed that the detectives were probably police officers at the time he allowed

17  them in his house.

18    The state responds that Aguro was not in custody, and notes that Aguro's alleged

19  subjective belief that he was not free to leave was not relevant to the issue of custody.  It

20  further points out that Aguro's belief that he was not free to leave was *not based on the*

21  *detectives' behavior*, but on the fact that he was watching his children, and argues that his

22  parental responsibilities are not dispositive on the issue.  Finally, the state argues that

23  Aguro has not presented clear and convincing evidence to overcome the presumption that

24  the state court's factual findings were correct.

25    In *Miranda v. Arizona*, the United States Supreme Court held that certain warnings

26  must be given before a suspect's statement made during custodial interrogation can be

27

28

**United States District Court**
For the Northern District of California

1  admitted in evidence.  384 U.S. 436 (1966).  *Miranda* requires that a person subjected to

2  custodial interrogation be advised that he has the right to remain silent, that statements

3  made can be used against him, that he has the right to counsel, and that he has the right to

4  have counsel appointed.  *Id.* at 444.  These warnings must precede any custodial

5  interrogation, which occurs whenever law enforcement officers question a person after

6  taking that person into custody or otherwise significantly deprive a person of freedom of

7  action.  *Id.* at 444.   "[I]n custody" means "'formal arrest or restraint on freedom of

8  movement' of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S.

9  1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

10      On federal habeas review, a determination whether an individual is "in custody" and

11 therefore entitled to *Miranda* warnings presents a mixed question of law and fact requiring

12 independent review by the federal habeas courts.  *See Thompson v. Keohane*, 516 U.S.

13 99, 107-110 & n.9 (1995).  The custody determination for *Miranda* purposes requires two

14 inquiries.  First, the state court must determine what the circumstances surrounding the

15 interrogation were.  That is a factual inquiry, entitled to a presumption of correctness under

16 28 U.S.C. § 2254(d).  *Id.* at 112-13; *see also Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir.

17 2000) (the "state trial court's answers to the 'scene- and action-setting questions' are

18 entitled to a presumption of correctness").

19      The second part of the custody determination inquires whether a reasonable person

20 in Aguro's position would have felt he was not at liberty to terminate the interrogation and

21 leave.  *Id.*  This second inquiry calls for application of the controlling legal standard to the

22 historical facts, and presents a mixed question of law and fact requiring the court to review

23 whether the state court's determination was contrary to, or involved an unreasonable

24 application of clearly established federal law, or resulted in a decision that was based on an

25 unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d); *Yarborough v.*

26 *Alvarado*, 541 U.S. 652, 663 (2004).

27      A determination that one is "in custody" requires that "a reasonable person have felt

28

**United States District Court**
For the Northern District of California

1    he or she was not at liberty to terminate the interrogation and leave," as judged by the

2    totality of the circumstances.  *Thompson*, 516 U.S. at 112.  The Ninth Circuit has identified

3    several factors relevant to the "in custody" determination:

> Pertinent areas of inquiry include [1] the language used by the officer to
> summon the individual, [2] the extent to which he or she is confronted with
> evidence of guilt, [3] the physical surroundings of the interrogation, [4] the
> duration of the detention and [5] the degree of pressure applied to detain the
> individual.  Based upon a review of all the pertinent facts, the court must
> determine whether a reasonable innocent person in such circumstances
> would conclude that after brief questioning he or she would not be free to
> leave.

9    *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981); *see, e.g., United States v.*

10   *Kim*, 292 F.3d 969, 977-78 (9th Cir. 2002).

11          The court concludes that the state court's credibility and "scene-setting" findings are

12   entitled to a presumption of correctness here.  Review of the transcripts and other pertinent

13   portions of the record demonstrates that it is Aguro who misreads the record.  Not only was

14   Aguro's testimony at the suppression hearing inconsistent on several points, but he now

15   seeks to rewrite history, and misrepresents his testimony at the hearing.

16          For example, as the trial court appropriately found, Aguro's testimony regarding his

17   awareness of the detectives' identity was indeed inconsistent.  Early in his direct

18   examination, he stated that the detectives identified themselves as police officers upon

19   entering his kitchen.  R.T. 59.  However, subsequently on direct examination, Aguro implied

20   that he did not know that the detectives were police officers - even after they were in his

21   kitchen.  R.T. 67.  Later, Aguro contradicted himself yet again, stating that he "guessed"

22   that the detectives were police officers upon entering his house.  R.T. 68.

23          Furthermore, Aguro's current assertion that he asked the officers to leave his home,

24   but that they refused to, and that he testified to this fact at the suppression hearing, is not

25   borne out by the record in this case.  There is no evidence that Aguro made such a

26   request; nor did Aguro testify as such before the state trial court.  For these reasons, the

27   court concludes that the state trial court's factual findings are entitled to a presumption of

28

United States District Court

For the Northern District of California

1    correctness.

2        The court thus turns to the second inquiry, which calls for application of the

3    controlling legal standards to the facts in this case.  Here, there is no evidence that

4    suggests that Aguro was in police custody at the time that he invited the detectives into his

5    home.  The fact that Aguro's parental responsibilities prevented him from leaving his home

6    does not render him in custody for Fifth Amendment purposes.  Those responsibilities

7    would presumably have prevented Aguro from leaving his house under *any* circumstances,

8    regardless of whether or not the officers were present.  It is also undisputed that Aguro was

9    not physically or verbally restrained in any manner, and that the visit lasted a short time,

10   approximately one-half hour, and took place entirely in his home.  Moreover, one is not

11   rendered in custody, such that *Miranda* warnings are required, simply because he is the

12   one whom the police suspect.   *Beheler*, 463 U.S. at 1124 n. 2 (rejecting the notion that the

13   "in-custody" requirement is satisfied by the mere fact that the person being interviewed is

14   the " 'focus' of a criminal investigation"); *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984)

15   ("[t]he mere fact that an investigation has focused on a suspect does not trigger the need

16   for *Miranda* warnings in noncustodial settings");

17       For these reasons, the state court's determination that Aguro was not in custody,

18   and therefore not entitled to his *Miranda* rights prior to questioning, was not contrary to

19   United States Supreme Court law or unreasonable based on the evidence before it; and,

20   for those reasons, Aguro's *Miranda* claim fails.

21       **C.    Invocation of Right to Counsel**

22       Aguro also argues that his constitutional rights were violated because the detectives

23   continued their questioning after he invoked his right to an attorney.  The state counters

24   that this claim fails because Aguro has not offered any evidence, let alone clear and

25   convincing evidence, to overcome the presumption that the state court's factual findings on

26   this issue were correct.

27

28

United States District Court

For the Northern District of California

1    A suspect who has expressed a desire to have counsel present during custodial

2  interrogation is not subject to further interrogation by the authorities until counsel is made

3  available to him.  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  However,

4  authorities may continue the interrogation if the suspect does not clearly request an

5  attorney.  *See Davis v. United States*, 512 U.S. 452, 459-62 (1994) (suspect must

6  unambiguously request counsel; "Maybe I should talk to a lawyer" insufficient).  Likewise,

7  interrogation may continue if the accused voluntarily initiates further communication.  *See*

8  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983).  Officers are not required to clarify

9  an ambiguous statement.  *See Davis*, 512 U.S. at 461-62.

10    For the reasons already stated above, the record demonstrates that the state trial

11  court's credibility and factual findings are entitled to a presumption of correctness.

12  Accordingly, because Aguro did not request an attorney, there has been no violation of his

13  Fifth Amendment rights, and the state court's ruling was not contrary to United States

14  Supreme Court law or unreasonable based on the evidence before it.

15    **D.    Coercion**

16

17    Aguro additionally contends that his confession was involuntary because the

18  detectives' questioning was coercive since, viewed objectively, Aguro had no meaningful

19  choice to leave.  He asserts that he was given the impression "that he would not be left

20  alone unless he gave a statement."  He again contends, contrary to the record, that he

21  asked the officers to leave, but they refused to do so, and suggests that the trial court's

22  findings on the issue were unreasonable because it failed to account for this fact.

23    The state points out that the trial court found Aguro's testimony lacking in credibility.

24  The state further argues that the record supports the trial court's findings that Aguro's

25  admissions were not coerced.  It notes that although Japanese is Aguro's first language, he

26  spoke English and worked for sixteen years in management at Sony in San Jose,

27  California.  It also notes that Aguro spoke English with Detective Sole, and never asked for

28

23

1  a translator or suggested that he did not understand the detective.  Additionally, it points

2  out that Aguro is college-educated, and holds a B.S. in electrical engineering.

3      Involuntary confessions in state criminal cases are inadmissible under the

4  Fourteenth Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960).  The

5  voluntariness of a confession is evaluated by reviewing both the police conduct in

6  extracting the statements and the effect of that conduct on the suspect.  *Miller v. Fenton*,

7  474 U.S. 104, 116 (1985).  Absent police misconduct causally related to the confession,

8  there is no basis for concluding that a confession was involuntary in violation of the

9  Fourteenth Amendment.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1985).

10      To determine the voluntariness of a confession, the court must consider the effect

11  that the totality of the circumstances had upon the will of the defendant.  *Schneckloth v.*

12  *Bustamonte*, 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of

13  the circumstances, the [state] obtained the statement by physical or psychological coercion

14  or by improper inducement so that the suspect's will was overborne."  *United States v.*

15  *Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).   A confession is only involuntary if

16  the police use coercive activity to undermine the suspect's ability to exercise his free will.

17  *Derrick*, 924 F.2d 813, 818 (9th Cir. 1990).  Personal characteristics of the defendant are

18  therefore irrelevant absent proof of coercion.  *Id*.

19      Voluntariness of a confession is not a factual issue entitled to a presumption of

20  correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent

21  consideration in a federal habeas corpus proceeding.  *Miller v. Fenton*, 474 U.S. 104, 110

22  (1985).  A federal habeas court must review de novo the state court's finding that a

23  confession was voluntarily given.  *Derrick*, 924 F.2d at 818.  But a state court's subsidiary

24  factual conclusions are entitled to the presumption of correctness.  *Rupe v. Wood*, 93 F.3d

25  1434, 1444 (9th Cir. 1996) (deferring to state appellate court's conclusion that challenged

26  statement did not constitute threat or promise).

27

28

24

United States District Court
For the Northern District of California

1    Again, for the same reasons stated above, the court finds that the trial court's related

2    credibility and factual findings are entitled to a presumption of correctness.  Like his

3    custody argument, Aguro relies on his parental responsibilities in arguing that he was not

4    free to leave.  However, as noted, it is the actions of the detectives that are relevant in

5    determining whether Aguro's statements were voluntary.  There is no evidence of coercive

6    behavior on the part of Detectives Sole and/or Pitt.  Accordingly, the state court's decision

7    was not contrary to United States Supreme Court law or unreasonable based on the

8    evidence before it.

9    **III.    Aguro has not Demonstrated Prosecutorial Misconduct in Violation of his**
**Constitutional Rights**
10

11    Aguro argues that his Sixth Amendment rights were violated when the prosecution

12    failed to provide his trial counsel with exculpatory evidence – the original audiotape of his

13    confession and interview with the detectives.

14    As noted, the trial court listened to an audiotape in connection with Aguro's motion to

15    suppress, and subsequently determined based on the audiotape, transcripts, and testimony

16    at the hearing, that Aguro had not requested an attorney.  Aguro now suggests that the

17    state tampered with the original audiotape, erasing his request for an attorney.  He frames

18    the issue as a claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)*, and *California v.*

19    *Trombetta,* 467 U.S. 479 (1984).  In a declaration filed with his habeas petition before the

20    California Supreme Court, Aguro asserts that his trial counsel was provided with an altered

21    copy of the audiotape of his confession.  He claims that his counsel sought the original from

22    the prosecution, but that the prosecution failed to turn it over.  Aguro asserts that his

23    counsel wanted the original audiotape so that it could be tested by an expert to determine

24    whether there had been any tampering.

25    This version of the facts, however, is not corroborated by the record; nor did Aguro

26    provide a declaration from his trial counsel corroborating his statements - or an explanation

27

28

**United States District Court**

For the Northern District of California

1   regarding the absence of a declaration from his counsel.[4]   It is impossible to determine

2   based on the record before this court what Aguro's trial counsel's intentions were, whether

3   Aguro's counsel had indeed requested the original audiotape from the prosecution, and

4   whether trial counsel ever received the original audiotape.   However, what is apparent from

5   the record is that Aguro's trial counsel never raised any objection on the record to the

6   audiotape he received during discovery, and also had no objection to the court's admission

7   of the audiotape at the suppression hearing.   *See* R.T. 51 (Aguro's trial counsel responded

8   that he had no objection to admission of the audiotape).   These two facts strongly suggest

9   that the picture painted by Aguro's self-serving declaration is, like his testimony at the

10  suppression hearing, lacking in credibility.

11         "[T]he suppression by the prosecution of evidence favorable to an accused upon

12  request violates due process where the evidence is material either to guilt or to

13  punishment, irrespective of the good faith or bad faith of the prosecution."   *Brady*, 373 U.S.

14  at 87.   A *Brady* claim has three components: "[t]he evidence must be favorable to the

15  accused, either because it is exculpatory, or because it is impeaching; that evidence must

16  have been suppressed by the state, either wilfully or inadvertently; and prejudice must have

17  ensued."   *Strickler v. Green*, 527 U.S. 263, 281-282 (1999); *see Banks v. Dretke*, 540 U.S.

18  668, 691 (2004).   Once constitutional error has been found under *Brady*, it cannot

19  subsequently be found harmless; the conviction must be set aside.   *See Kyles v. Whitley*,

20  514 U.S. 419, 436 (1995).

21         For the first component of the claim, evidence is exculpatory if it is "merely favorable

22  to the accused."   *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).   The Supreme Court

23  limited *Brady's* reach in *Trombetta,* 467 U.S. at 479, and *Arizona v. Youngblood,* 488 U.S.

24  51 (1988).   *Trombetta* holds that, for the *Brady* standard to apply, "evidence must . . .

25  possess an exculpatory value that was apparent *before* the evidence was destroyed."

26

27         [4]   This is in spite of the fact that the state pointed out in its opposition to Aguro's state
    habeas petition that such a declaration was essential to Aguro's claim.

28

United States District Court

For the Northern District of California

1  *Richter v. Hickman*, 2008 WL 943584 at *8 (9th Cir. April 9, 2008) (citing 467 U.S. at 489).

2  *Youngblood* similarly holds that the state's failure to preserve "potentially useful" evidence

3  does not constitute a due process violation unless the defendant can show bad faith on the

4  part of the police.  *Id.* (citing 488 U.S. at 58); *see also United States v. Estrada,* 453 F.3d

5  1208, 1212 (9th Cir. 2006) (drawing a distinction between "potentially exculpatory" and

6  "apparently exculpatory" evidence).

7       For the second component, the state has no good faith or inadvertence defense to a

8  *Brady* claim; whether nondisclosure was negligent or by design, it is the responsibility of the

9  prosecutor.  *Gantt*, 389 F.3d at 912.  However, there is no suppression where the

10  government discloses all information necessary for the defense to discover alleged *Brady*

11  material on its own.  *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995).

12      The terms "material" and "prejudicial" are used interchangeably to describe the third

13  component.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003);  *see also Benn v.*

14  *Lambert*, 283 F.3d 1040, 1053 n. 9 (9th Cir. 2002) ("Evidence is not 'material' unless it is

15  'prejudicial,' and not 'prejudicial' unless it is 'material'").  "Prejudice" and "materiality" are

16  interchangeable because the *Brady* standard for materiality is the same as the standard for

17  determining prejudice in ineffective assistance of counsel claims.  *See Kyles*, 514 U.S. at

18  434 (court adopted "reasonable probability" standard for *Brady* claims from *Strickland v.*

19  *Washington*, 466 U.S. 668, 694 (1984)); *United States v. Bagley*, 473 U.S. 667, 682 (1985)

20  (*Strickland* formulation is sufficiently flexible to cover cases of prosecutorial failure to

21  disclose favorable evidence).

22

23      The "touchstone of materiality is a 'reasonable probability' of a different result."

24  *Kyles*, 514 U.S. 419, 434 (1995).  This reasonable probability is "shown when the

25  government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

26  *Id.* (quoting *Bagley*, 473 U.S. at 678). The ultimate question for materiality is thus whether

27  "disclosure of the suppressed evidence to competent counsel would have made a different

28  result reasonably probable."  *Id.* at 441.  The materiality of the suppressed evidence is

1   considered with the evidence admitted at trial.  *See United States v. Ross*, 372 F.3d 1097,

2   1107-1108 (9th Cir. 2004); *see also United States v. Agurs*, 427 U.S. 97, 112 (1976)

3   (materiality of suppressed evidence must be evaluated in the context of the entire record).

4        Aguro's instant claim fails to satisfy all three components of the *Brady* test.  First,

5   there is absolutely no evidence to suggest that, if produced in its original form, the original

6   audiotape would have been exculpatory.  Nor is there any evidence that the state tampered

7   with the audiotape, and/or produced a copy of the audiotape to the state trial court and/or

8   Aguro's trial counsel that varied from the original.  In fact, as noted, Aguro consented to the

9   trial court's reliance on his taped confession in conjunction with his *Bunnell* plea.

10  Presumably, if Aguro believed the tape had been tampered with, he would not have

11  consented to the trial court's admission of the tape for those purposes.  Second, even if this

12  court were to accept that the original audiotape could be considered exculpatory, there is

13  no credible evidence before the court that the state suppressed the audiotape.

14       Finally, even if the original audiotape could be considered exculpatory, and if this

15  court accepted Aguro's claim that the state refused to turn it over to his trial counsel, he is

16  unable to show that a reasonable probability that the audiotape would have produced a

17  different result.  *See id.* at 434.  First, Aguro's claim that the state tampered with the

18  original audiotape is based entirely on speculation, and there is absolutely no evidence that

19  this was the case.  Whether a "reasonable probability" exists may not be based on mere

20  speculation without adequate support.  *See Wood v. Bartholomew,* 516 U.S. 1, 6-8 (1995);

21  *see also Downs*, 232 F.3d at 1037 (rejecting as speculative an argument that withheld

22  material – namely, police leads, including pictures and names of suspects – might have led

23  to some admissible evidence that might have been sufficiently favorable to meet the *Brady*

24  standard).  Second, the trial court's finding that Aguro did not invoke his right to counsel

25  was based not only on its review of the audiotape, but also on Aguro's and the officers'

26  testimony at the suppression hearing.

27       Because Aguro is unable to satisfy any of the three *Brady* components, the court

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   concludes that the California Supreme Court's postcard denial of this claim was not

2   contrary to United States Supreme Court law or unreasonable based on the evidence

3   before it.

4   **IV.   Aguro's *Bunnell* Plea was Knowing and Voluntary**

5       Aguro also argues that his Fifth, Sixth, and Fourteenth Amendment rights were

6   violated because he did not knowingly and voluntarily waive his right to a jury trial and other

7   related rights in conjunction with his *Bunnell* plea.

8       **A.   Background**

9

10      As noted, after conducting the hearing on Aguro's motion to suppress his

11  confession, the trial court brought the jurors back in to the courtroom, gave its preliminary

12  jury instructions, and both counsel made their opening arguments.  The court then

13  recessed for lunch.  Following lunch, defense counsel advised the court that Aguro decided

14  to waive his right to a jury trial and submit to a court trial under *Bunnell*.  Defense counsel

15  noted that the court could take evidence if it desired, but that the parties had stipulated that

16  the court could rely solely on the police reports, the preliminary examination transcript,

17  Aguro's and the victims' tape-recorded statements, the victims' sexual assault response

18  reports, and the testimony and evidence at the hearing on Aguro's motion to suppress.

19  Aguro was present and was assisted by a court-certified Japanese interpreter at the time.

20  R.T. 98.

21      The court then conducted a lengthy colloquy with Aguro regarding the waiver of his

22  jury trial and other related rights as follows, in pertinent part.

23      Court:  Do you understand the charges against you?

24

25      Aguro: Yes, your honor.

26      Court: Have you had enough time to speak to your attorney about the charges so
        that you understand what the district attorney must prove to show your guilt as well
27      as any possible defense you might have?

28

29

Aguro: Yes, your honor.

Court: Are you satisfied with that advice and representation?

Aguro: Yes, your honor.

Court: Now, in return for your waiver giving up certain rights, the indicated sentence if you are convicted of these charges or some of these charges would be between 16 and 32 years.  Is that your understanding?

Aguro: Yes, your honor.

Court: Have there been any other promises made to you?

Aguro: No, your honor.

Court: Have there been any threats made to you?

Aguro: No.

Court: Is your decision to give up the rights I'm about to ask you about being made free and voluntary, freely and voluntarily because this is what you want to do?

Aguro: Yes, your honor.

. . . .

Court: Now you are giving up important constitutional rights that apply equally to each of the charges.  First is the right to have a jury trial which is what we have started yesterday and today.  That trial is in front of 12 citizens of the community and the district attorney must prove your guilt beyond a reasonable doubt before you can be convicted of a charge.  Do you understand and give up the right to have a jury trial?

Aguro: Yes, your honor.

Court: At the jury trial – I'm trying to think how to phrase this if you are going to have a court trial.  That means that evidence is going to be presented to me and I will decide whether or not the DA has proven the charges beyond a reasonable doubt.  So you will have a court trial.  Do you understand that?

30

Aguro: Yes, your honor.

Court: Now you are – even though it's a court trial, are giving up certain constitutional rights because you are agreeing to submit the case or the evidence of the case by way of the preliminary examination hearing transcript, the police reports, the sexual assault response report.

Prosecutor: Reports actually, plural.  There are two.

Court: Thank you, reports.  Tapes of Alisa and of Sara.  Tapes, the tape of yourself with Detective Sole.  As well as the testimony that was given this morning in the hearing that we had where you testified and Detective Sole and Lieutenant Pitts testified.  Is that your understanding that you will be submitting your court trial based on that evidence?

Aguro: Yes.

Court: Now, you do have constitutional rights that you are giving up by way of submitting the matter to the court for court trial.  And also these are rights that you could exercise at jury trial and you're giving those up.

   So let me – They apply to both of the trials that you are giving up. One, you're giving up the jury trial, you're giving up that right.  The court trial you're going to have the court trial, but there are certain rights you could exercise at the court trial that you're giving up by way of submitting the trial based on these reports.

   *First is the right to confront and cross-examine witnesses.  That means see and hear the witnesses and through your attorney ask questions.  Do you understand and give up this right?*

Aguro: *Yes, your honor.*

Court: Next is the right to use the subpoena power of the court to compel the attendance of witnesses for your defense as well as production of evidence. Do you understand and give up this right?

Aguro: Yes, your honor.

Court.  Now, you have the right against self-incrimination, also known as the right to remain silent.  No one can force you to give testimony against yourself, no one can force you to testify and I have to tell you by way of submitting this case based upon these reports, you are in fact incriminating yourself and will most likely be convicted of some or all of the charges.

So, at this time do you understand and give up the right against self-incrimination?

Aguro: Yes, your honor.

Court: Finally, sir, *you would have the right to testify on your behalf at a trial in front of the jury or in front of me.  But at this time do you understand that you have that right and do you give up that right?*

Aguro: *Yes, your honor.*

Court: And, again this is, we call it a *Bunnell* plea after a famous case.  We also refer to it as a slow plea.  And that means that based upon the evidence that is contained in these reports, in all likelihood, you will be convicted of some or all of these charges.  Do you understand this?

Aguro: Yes, your honor.

. . . .

Court: Mr. Aguro, *Do you have any questions of your attorney or the district attorney or myself?*

Aguro: *No, your honor.*

. . . .

Court: I will accept the waivers.  At this time I find that Aguro understands and freely waives his constitutional rights, the first being the right to a jury trial and the right, the four constitutional rights that would attach to a jury trial.

I find he also understands and freely waives the constitutional rights that he could exercise at a court trial, that being the right to confront and cross-examine witnesses, use the subpoena power of the court, the right against self-incrimination and the right to testify.

I find he understands the nature of the crimes charged and all consequences of his waivers and that his waivers are entered freely, knowingly, and voluntarily.

R.T. 102-109 (emphasis added).

Subsequently, at Aguro's sentencing hearing, his counsel made numerous

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    statements on Aguro's behalf in favor of a lesser sentence, and specifically in favor of

2    probation.   He noted that Aguro was remorseful and did not want the victims to have to

3    testify at trial.   Counsel asserted that Aguro "respected the Court's decision on his [motion

4    to suppress] and did not want to put the girls through any further trauma which is why [he]

5    did the [*Bunnell*] submission that [he] did."   R.T. 154.   Counsel also noted that Aguro had

6    represented to probation: "I want the counseling, I want the help.   I've tried to put this out of

7    my mind.   I don't want to think about what I did.   I know I have to think about it."   R.T. 155.

8    Defense counsel also emphasized the fact that Aguro could contribute greatly to society in

9    the future because he is an electrical engineer, and is well-educated.   R.T. 155.

**B.    Legal Standards**

As noted, in accordance with a *Bunnell* plea, sometimes referred to as a "slow plea,"

the defendant enters a plea of not guilty, after which the case is submitted to the judge for

decision upon stipulated facts, while reserving his right to appeal.   *See Sanchez*, 12 Cal.4th

at 27-30.   A conviction based on stipulated facts, or a "slow plea," is valid only if the

defendant knowingly and voluntarily agreed to the stipulation.   *Adams v. Peterson,* 968

F.2d 835, 843 (9th Cir. 1992); *accord United States v. Larson*, 302 F.3d 1016, 1020-21 (9th

Cir. 2002).   The defendant must enter into the stipulation with "sufficient awareness of the

relevant circumstances and likely consequences."   *Adams*, 968 F.2d at 844.

In *Bunnell*,  the California Supreme Court held that before the defendant submits the

case on a *Bunnell* plea, he or she must be advised of and waive the following rights before

the court may accept the plea: (1) the right to a jury trial; (2) the right to confrontation and

cross-examination of witnesses; and (3) the right against self-incrimination.   13 Cal.3d at

605.   Additionally, the record is also required to demonstrate that the defendant

understands the nature of the charges, and has been advised of the direct consequences

of conviction.   *Id.*

////

**United States District Court**
For the Northern District of California

### C. Discussion

Aguro argues that his plea was involuntary because: (1) it was entered on the basis of false or misleading information provided to him by his trial counsel; (2) he was pressured or coerced to enter the plea by his counsel; (3) he lacked familiarity with the American legal system and had difficulty understanding the court's advisements; and (4) he did not have an opportunity to ask all his questions of counsel prior to entering the plea.   The only evidence that Aguro has submitted in support of this claim and the related arguments are his declarations submitted with his habeas petition filed before the California Supreme Court.

### i. False or Misleading Information Provided by Trial Counsel

Aguro first claims that his plea was involuntary because it was entered on the basis of false or misleading information provided to him by his trial attorney.  He asserts that it was his "true wish" to be able to question the child witnesses in front of a jury so that he could point out the mistakes, misunderstandings, and exaggerations in their statements, so as to demonstrate his innocence.  Aguro also claims that he wanted to take the stand so that he could demonstrate that his purported confession to officers was made under duress and was untrue.  Aguro contends that his counsel told him that "these things wouldn't make a difference in the superior court," and without explaining how, implies that such advice was false or misleading.

Aguro also argues that his trial counsel misrepresented the effect of his waivers.  He claims that his attorney told him that by entering a *Bunnell* plea, he could still "raise anything he wanted to in the appellate court."  Aguro asserts that he interpreted that advice to mean that he would nevertheless be afforded an opportunity to confront the child witnesses and present his case.  Aguro also claims that, contrary to his trial counsel's advice, he has now been advised by other counsel that he "waived most of his appellate rights."

**United States District Court**
For the Northern District of California

1    This court finds Aguro's above arguments lacking both in merit and credibility.  First,

2  Aguro's statements that he wanted to question the child witnesses and to testify are

3  contradicted by the record in this case, specifically by Aguro's responses to the trial judge's

4  questions during the *Bunnell* waiver colloquy, and to arguments made on Aguro's behalf by

5  his trial counsel at the sentencing hearing.  Aguro's statements otherwise, as contained in

6  his state court habeas declarations, are self-serving and, like his testimony at the

7  suppression hearing before the trial court, of questionable credibility.  *See Turner v.*

8  *Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (rejecting "self serving" statement by petitioner

9  in federal habeas proceedings that his attorney rendered ineffective assistance because

10  had he known his exposure would increase to thirty-seven years, he would have accepted

11  a plea offer)*; see also United States v. Allen,* 153 F.3d 1037, 1041 (9th Cir. 1998) (citing

12  *Cuppett v. Duckworth,* 8 F.3d 1132, 1139 (7th Cir. 1993) ("[S]elf-serving statements by a

13  defendant that his conviction was constitutionally infirm are insufficient to overcome the

14  presumption of regularity accorded state convictions.")).

15    Moreover, the reason that Aguro asserts that he desired to testify at trial - to

16  demonstrate that his confession to officers was made under duress and was untrue - was

17  the very purpose of the suppression hearing.  At that hearing, Aguro did indeed have an

18  opportunity to testify and present evidence in favor of his argument that his confession was

19  coerced.  As noted previously, the trial court reasonably rejected Aguro's related testimony

20  as lacking in credibility.

21    Second, Aguro's interpretation of trial counsel's alleged advice that he could "raise

22  anything he wanted to in appellate court" to mean that he could confront the child witnesses

23  was unreasonable and is also lacking in credibility.  In fact, it is contradicted by Aguro's

24  admission in his very same declaration that his attorney told him that "if he waived a jury

25  trial, the child witnesses would not have to appear."  Moreover, Aguro has not pointed to

26  any other claims that he wished to raise on appeal that he was unable to as a result of his

27  *Bunnell* plea.  In fact, if one considers separately his five sub-claims for ineffective

28

35

assistance of counsel, Aguro has indeed raised *eleven* claims in his petition before this court, and raised ten of those claims in his habeas petition before the California Supreme Court, which adjudicated all ten claims on the merits, and one of the claims on direct appeal before the California Court of Appeal and the California Supreme Court, which the courts also adjudicated on the merits.  Accordingly, absent any showing regarding specific, potentially viable appellate claims that Aguro was unable to raise, it appears to this court that Aguro's counsel's advice was actually quite accurate given the circumstances of this case.

### ii.    Coercion

Aguro also argues that he was unduly pressured or coerced by his attorney to enter a *Bunnell* plea because it would be better for the child witnesses.  He also suggests that his counsel encouraged him to enter the plea because counsel was unprepared to go to trial, and claims he heard his attorney remark "I'm not ready for this."

Again, Aguro's claims are self-serving, uncorroborated, and not supported by any record evidence.  Aguro expressed no hesitation on the record in entering his *Bunnell* plea, assured the court that he was satisfied with his attorney's representation, and stated that he had not been threatened or received any promises in return for his plea.  Moreover, in spite of the opportunity to do so, Aguro failed to submit a declaration from his trial counsel in support of this claim or any others, and similarly failed to explain his failure to do so.[5]

### iii.    Cultural/Language Barriers

Aguro also now claims that because Japanese is his first language, and because he was unfamiliar with the American legal system, he did not fully understand the judge's advisements during the *Bunnell* procedure.  He contends that he responded to the judge as his attorney wanted him to respond, and states that he simply said "yes," when his counsel

---

[5]The state noted repeatedly in its opposition to Aguro's state habeas petition that a declaration from trial counsel and the court interpreter was necessary to corroborate several of the claims raised before the state court.  *See* Exh. C, Opposition Brief, at 12, 17, and 22.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   instructed him to do so.

2       Aguro also suggests that he had difficulty understanding his counsel's advice

3   regarding the *Bunnell* plea based on language difficulties.  He claims that his interpreter

4   was absent or unavailable at the time he was discussing the *Bunnell* plea with his attorney.

5       Again, it is worth noting that other than his own declaration, Aguro is unable to point

6   to any evidence supporting this claim.  He has not submitted a declaration from his trial

7   counsel, or from the court-certified interpreter.  Nor did Aguro ever express any difficulty or

8   hesitation understanding the court on the record, or object that he was unable to

9   understand his interpreter.  Furthermore, he was provided with a court-certified interpreter

10  at all proceedings.  Moreover, at the hearing on Aguro's motion to suppress, he

11  occasionally answered questions posed to him by the prosecution in English, with a

12  response in English as well.  Finally, as noted by the state, prior to his arrest, Aguro spoke

13  English and worked for sixteen years in management at Sony in San Jose, California.

14      **iv.    Questions for Counsel re: Aguro's *Bunnell* Plea**

15

16      Finally, Aguro contends that he was unable to ask counsel questions he had prior to

17  his *Bunnell* plea.  He claims that his interpreter advised him that his counsel was "too busy"

18  for his questions.

19      Aguro has failed entirely to specify which questions counsel failed to address, which

20  suggests that whatever questions Aguro had were satisfied by subsequent discussions with

21  counsel or by the court's colloquy.  More importantly, Aguro's factual allegations again are

22  not corroborated or supported by the record in this case.  Aguro never complained about or

23  even hinted at dissatisfaction with the court-certified interpreter.

24      In sum, the court finds Aguro's latest assertions regarding the facts surrounding the

25  entry of his *Bunnell* plea lacking in credibility and contrary to the record in this case.  The

26  record demonstrates that Aguro was advised of and understood the rights that he was

27  waiving in conjunction with his *Bunnell* plea, and that his waiver was knowing and

28

37

United States District Court
For the Northern District of California

1 voluntary.  Accordingly, the California Supreme Court's postcard denial of this claim was

2 not contrary to United States Supreme Court law or unreasonable based on the evidence

3 before it.

4 **V.     Aguro did not Receive Ineffective Assistance of Counsel**

5      Finally, Aguro contends that he was denied his right to the effective assistance of

6 counsel based on five sub-claims, many of which are related to the substantive claims

7 already addressed above.  He contends that his trial counsel was ineffective because he:

8      (1) induced Aguro to waive his constitutional rights by entering into a *Bunnell* plea;

9

10      (2) failed to litigate the prosecution's failure to produce the original tape recording of

11      Aguro's confession;

12      (3) failed to adequately investigate and present evidence that the victims' testimony

13      was false and the product of undue influence; and

14      (4) failed to allow Aguro to testify on his own behalf at trial.

15      Additionally, Aguro claims that his appellate counsel was ineffective because she

16 failed to raise as error on direct appeal the trial court's admission of Aguro's confession,

17 which was procured in violation of his Fifth Amendment rights.

18      **A.     Legal Standards**

19

20       "[T]he right to counsel is the right to the effective assistance of counsel."  *Strickland*,

21 466 U.S. at 686.  "An ineffective assistance claim has two components:  A petitioner must

22 show that counsel's performance was deficient, and that the deficiency prejudiced the

23 defense."  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687).

24 The court is not required to find counsel's performance deficient before considering

25 whether the performance prejudiced petitioner's defense.  *Strickland*, 466 U.S. at 697.  If

26 the petitioner makes an insufficient showing of either component, the court does not have

27 to consider the other.  *Id.*  Specifically, "[i]f it is easier to dispose of an ineffectiveness claim

28

United States District Court

For the Northern District of California

1  on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

2      To establish deficient performance, a petitioner must demonstrate that counsel's

3  representation fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at

4  521.  The Supreme Court has "declined to articulate specific guidelines for appropriate

5  attorney conduct and instead ha[s] emphasized that the proper measure of attorney

6  performance remains simply reasonableness under prevailing professional norms." *Id.*

7  Thus, the reasonableness of counsel's conduct must be measured against the professional

8  norms prevailing at the time of counsel's representation.  *See Rompilla v. Beard*, 545 U.S.

9  374, 386-87 (2005) (citing American Bar Association Standards for Criminal Justice in

10  circulation at time of defendant's trial); *Wiggins*, 539 U.S. at 522-23 (citing American Bar

11  Association professional standards and standard practice in capital defense at pertinent

12  time).

13      Judicial scrutiny of counsel's performance must be highly deferential, and review

14  must start with a strong presumption that counsel's conduct falls within the wide range of

15  reasonable professional assistance.  *See Strickland*, 466 U.S. at 689.  In addition, a

16  determination of the reasonableness of defense counsel's conduct is based on facts of the

17  particular case viewed from the time of counsel's conduct.  *Id.* at 690.  Thus, the relevant

18  inquiry is not what defense counsel could have done, but rather whether the choices made

19  by defense counsel were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th

20  Cir. 1998).  Therefore, a claim of ineffective assistance of counsel requires an identification

21  of the acts or omissions of counsel that are alleged to have been objectively unreasonable.

22  *Strickland*, 466 U.S. at 690.

23      **B.**      **Discussion**

24          **i.**      **Trial Counsel's Inducement that Aguro Enter into a *Bunnell* Plea**

25      Aguro relies on the same facts as discussed above with respect to the voluntariness

26

27  of his *Bunnell* plea, and argues that counsel's misrepresentations and coercion induced

28

United States District Court

For the Northern District of California

1  him into entering into a *Bunnell* plea.  Aguro claims that he would not have entered the plea

2  absent the misrepresentations and coercion.

3      In order to show that his counsel's performance was deficient, Aguro must

4  demonstrate that the advice he received from counsel was not within the range of

5  competence demanded of attorneys in criminal cases.  *See Hill v. Lockhart*, 474 U.S. 52,

6  56 (1985); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *United States v. Signori*, 844

7  F.2d 635, 638 (9th Cir. 1988).   Additionally, to establish *Strickland*'s prejudice requirement,

8  Aguro must also show that there is a reasonable probability that, but for counsel's errors,

9  he would not have pleaded guilty and would have insisted on going to trial.  *See Hill*, 474

10  U.S. at 57-59; *Iaea v. Sunn*, 800 F.2d 861, 864-65 (9th Cir. 1986).

11      This sub-claim fails because Aguro is unable to demonstrate either deficient

12  performance or prejudice as required by *Strickland.*  First, even if counsel made the

13  statements Aguro attributes to him in his declaration, the statements are not outside the

14  "range of competence" of counsel in criminal cases.  As discussed above, counsel's

15  statements actually turned out to be accurate.  Moreover, assuming that counsel

16  encouraged Aguro to enter into a *Bunnell* plea, this advice also would not have been

17  outside the general range of competence.  At the time that Aguro entered into the plea, the

18  trial court had already denied his motion to suppress his confessions.  Aguro's confessions,

19  which were tape-recorded, in addition to the victims' statements and the sexual assault

20  reports that strongly suggested that the victims had indeed been sexually assaulted,

21  amounted to overwhelming evidence in favor of conviction.  Accordingly, it would not have

22  been unreasonable for counsel to encourage the *Bunnell* plea as an option for Aguro.

23      Moreover, Aguro is unable to demonstrate prejudice.  As discussed, Aguro's

24  colloquy on the record with the trial judge demonstrated that he was knowingly and

25  voluntarily waiving his right to a jury trial, and that he was satisfied with his counsel's

26  performance.  There was nothing to suggest any hesitation on Aguro's part, or any desire

27  to go forward with the jury trial.  Again, Aguro's after-the-fact self-serving declarations

28

United States District Court

For the Northern District of California

1
2
simply are not corroborated by the record in this case. *See Turner*, 281 F.3d at 881; *Allen,* 153 F.3d at 1041.

3
### ii.   Trial Counsel's Failure to Litigate Aguro's *Brady* Claim

4
5
6
7
8
9
10
11
12
13
14
15
Aguro also claims that his counsel was ineffective for failing to "litigate" the prosecution's failure to produce the original audiotape of Aguro's confession.  Presumably, Aguro is arguing that counsel should have filed a motion to compel production of the tape.  However, as noted above in this court's discussion of the underlying *Brady* claim, it is impossible to determine from the record in this case whether Aguro's trial counsel received a copy of the audiotape - instead of the original – as Aguro now claims, and whether Aguro's counsel had indeed requested the original audiotape from the prosecution, as Aguro asserts.  Moreover, this lack of clarity is unaided by the fact that Aguro also failed to submit a declaration from his trial counsel on the underlying *Brady* issue.  Accordingly, given this ambiguity, the court must conclude that Aguro has not established deficient performance on the part of his trial counsel.

15
16
17
18
19
20
21
22
23
Nevertheless, it is unnecessary for this court to reach the deficient performance issue because Aguro is unable to demonstrate prejudice.  This court has already concluded above that Aguro was unable to show materiality with respect to the underlying *Brady* claim.  Because the *Brady* standard for materiality is the same as the standard for determining prejudice in ineffective assistance of counsel claims, the court concludes for the same reasons that it did above that Aguro has not established prejudice with respect to this ineffective assistance of counsel claim.  *See Kyles*, 514 U.S. at 434 (court adopted "reasonable probability" standard for *Brady* claims from *Stricklana*, 466 U.S. at 694).

24
25
### iii.   Trial Counsel's Failure to Investigate and Present Evidence that the Victims' Statements were False and the Product of Undue Influence

26
27
Aguro suggests, without any corroborating evidence, that the child victims' statements were erroneously translated, unduly influenced by their parents, and also

28

**United States District Court**
For the Northern District of California

1   subject to misinterpretation.  He contends that his counsel failed to properly investigate the

2   victims, and that such failure prejudiced him because his best defense would have been

3   that the children were lying.

4          Unfortunately, again, Aguro has submitted no evidence by which this court may

5   ascertain whether and the extent to which counsel investigated the victims' backgrounds

6   and statements.  Nor is it clear from the record.  However, it does appear that, given

7   Aguro's confessions with respect to both victims, Aguro's admissions to probation officers,

8   and statements made at the sentencing hearing, Aguro did not protest his factual

9   innocence at the trial court level.  Accordingly, if this was the case, and Aguro was not

10  contesting his guilt, then there would have been no reason for counsel to investigate the

11  victims.  Alternatively, Aguro also expressed a desire to shield the victims from further

12  trauma before the trial court.  Thus, Aguro may have instructed his counsel not to interview

13  the victims.   Again, given the dearth of record evidence regarding the necessity for and

14  scope of investigation, if any, the court concludes that Aguro has not established deficient

15  performance on the part of his trial counsel.

16         The court also concludes that Aguro is unable to demonstrate prejudice.  Aguro is

17  unable to point to any evidence - aside from his own conjecture - that the victims'

18  statements were false or coerced.  Furthermore, as noted, prior to his arrest, Aguro

19  confessed to the conduct underlying the charges.  Additionally, following the entry of his

20  *Bunnell* plea and prior to sentencing, Aguro again admitted to molesting the victims in an

21  interview with a probation officer, an interview during which Aguro was again assisted by a

22  court-certified interpreter.  In that interview, Aguro admitted that

23

24          he believe[d] the molests occurred due to impulses. . . .  He realize[d] that
           there may have been inappropriate acts committed by him and reports having
25          internal conflict due to the fact that part of him wants to recall what happened
           and the other part does not.  . . .  If he could take back what he has done, . . .
26          he would.  He is regretful and apologetic to the victims for causing them such
           pain.  He plans to make every attempt to assure that these crimes will not
27          reoccur.  In order to meet this goal, he plans to attend psychological
           counseling so that the impulses do not occur again and will avoid young
28          children.

United States District Court

For the Northern District of California

1   C.T. 349-50.

2          **iv.    Trial Counsel's Failure to Allow Aguro to Testify on his own**
3                  **Behalf**

4          Finally, with respect to trial counsel's conduct, Aguro claims that his trial counsel

5   was ineffective for not ensuring that he proceeded to a jury trial so that he could testify to

6   his innocence and explain why the victims' statements were inaccurate.  However, this

7   court has already rejected Aguro's claim that he was unduly coerced or influenced into

8   entering the *Bunnell* plea.  Accordingly, because Aguro knowingly and voluntarily waived

9   his right to a jury trial, this claim is without merit.

10         **v.     Appellate Counsel's Failure to Challenge Aguro's Confession on**
11                 **Direct Appeal**

12         Aguro also claims that his appellate counsel was ineffective because she failed to

13  raise claims regarding the constitutionality of his confessions on direct appeal.

14         The Due Process Clause of the Fourteenth Amendment guarantees a criminal

15  defendant the effective assistance of counsel on his first appeal as of right.  *See Evitts v.*

16  *Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel

17  are reviewed according to the standard set out in *Strickland.  Miller v. Keeney*, 882 F.2d

18  1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).  A

19  defendant therefore must show that counsel's advice fell below an objective standard of

20  reasonableness and that there is a reasonable probability that, but for counsel's

21  unprofessional errors, he would have prevailed on appeal. *Miller*, 882 F.2d at 1434 & n.9

22  (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

23

24         It is important to note that appellate counsel does not have a constitutional duty to

25  raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S.

26  745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882

27  F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the

28  hallmarks of effective appellate advocacy.  *See id.* at 1434.  Appellate counsel therefore will

1  frequently remain above an objective standard of competence and have caused her client

2  no prejudice for the same reason – because he declined to raise a weak issue.  *Id.*

3       There is nothing in the record, nor did Aguro submit a declaration from appellate

4  counsel with his state habeas petition, explaining appellate counsel's reasons for failing to

5  raise the claims on appeal.  However, given this court's review of the confession-related

6  claims, including its review of the record, the evidence from the suppression hearing, the

7  relevant authority, and for all of the reasons stated above, it would have been reasonable

8  for appellate counsel to weed out the claims as weak and determine that they were unlikely

9  to succeed on appeal.  Thus, appellate counsel's performance was not deficient; nor is

10  there a reasonably probability that Aguro would have prevailed on these claims on appeal.

11       In sum, for all of the above reasons, the California Supreme Court's postcard denial

12  of these sub-claims for ineffective assistance of counsel was not contrary to United States

13  Supreme Court law or unreasonable based on the evidence before it.

14  **VI.  Aguro's Request for an Evidentiary Hearing[6]**

15

16       Aguro also requested an evidentiary hearing as to all of the claims raised in his

17  habeas petition, with the exception of the substantive claims pertaining to his confession

18  and the claim that his sentence violated the extradition treaty.

19       The requirements of 28 U.S.C. § 2254(e)(2) govern requests for evidentiary

20  hearings.  Section 2254(e)(2) provides:

21       If the applicant has failed to develop the factual basis of a claim in state court
         proceedings, the court shall not hold an evidentiary hearing unless the
22       applicant shows that:

23
         (A) the claim relies on–
24

25

_____

26       [6]On January 10, 2008, the court issued an order deferring ruling on Aguro's motion for
   an evidentiary hearing until it issued an order on the merits of the petition, noting that the
27  determination regarding the necessity of an evidentiary hearing depended, to a large degree,
   on its review of Aguro's claims on the merits.
28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

3

4

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and*

5

6

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

7   The United States Supreme Court has interpreted the opening paragraph of the

8   section to provide that where a petitioner has indeed exercised diligence to "develop the

9   factual bases" of his claims in state court, the requirements of section 2254(e)(2)(A)& (B)

10   do not apply to his request for an evidentiary hearing.  *Williams v. Taylor*, 529 U.S. 420,

11   435 (2000); *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).  In other words, a petitioner

12   who has exercised such diligence will be taken out of the purview of section 2254(e)(2).

13   *Griffey v. Williams*, 345 F.3d 1058 (9th Cir. 2003), *vacated on other grounds as moot*, 349

14   F.3d 1157 (9th Cir. 2003) (petitioner died); *Williams*, 529 U.S. at 430 (showing under

15   2254(e)(2) "applies only to prisoners who have 'failed to develop the factual basis of a claim

16   in state court proceedings'").

17   Diligence "depends upon whether petitioner made a reasonable attempt, in light of

18   the information available at the time, to investigate and pursue claims in state court."

19   *Williams*, 529 U.S. at 435.  Diligence requires in the usual case that the prisoner, at a

20   minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.

21   *Id.*  Here, Aguro requested an evidentiary hearing in conjunction with his habeas petition in

22   the California Supreme Court, which this court must presume that the state court denied on

23   the merits in its postcard denial.  Thus, Aguro can be said to have exercised some degree

24   of diligence in so far as he requested an evidentiary hearing.

25   However, even though Aguro may have exercised diligence in making the request

26   before the state court, there is no per se requirement for an evidentiary hearing.  *Turner*,

27   281 F.3d at 890.  Rather, "a federal court must consider whether such a[n] [evidentiary]

28

45

United States District Court

For the Northern District of California

1    hearing could enable an applicant to prove the petition's factual allegations, which, if true,

2    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 127 S.Ct. 1933,

3    1940 (2007).  Additionally, in considering whether the applicant would be entitled to federal

4    habeas relief, a federal court must take into account the deferential standards of 28 U.S.C.

5    § 2254. *See id.*  Moreover, "if the record refutes the applicant's factual allegations or

6    otherwise precludes habeas relief, a district court is not required to hold an evidentiary

7    hearing." *Schriro*, 127 S.Ct. at 1940 (citing *Totten v. Merkle,* 137 F.3d 1172, 1176 (9th Cir.

8    1998) (affirming the denial of an evidentiary hearing where the applicant's factual

9    allegations "fl[ew] in the face of logic in light of ... [the applicant's] deliberate acts which are

10   easily discernible from the record"); *Anderson v. Attorney General of Kan.,* 425 F.3d 853,

11   858-859 (10th Cir. 2005) (holding that no evidentiary hearing is required if the applicant's

12   allegations are contravened by the existing record); *Clark v. Johnson,* 202 F.3d 760, 767

13   (5th Cir. 2000) (holding that no hearing is required when the applicant has failed to present

14   clear and convincing evidence to rebut a state court's factual findings)).

15          Here, Aguro's claims may be resolved largely by reference to the state court record,

16   and as discussed above, many of Aguro's latest factual allegations fly in the face of the

17   record and/or the state court's factual findings, which this court has determined are entitled

18   to a presumption of correctness under AEDPA.  *See Totten,* 137 F.3d at 1176*; Gandarela*

19   *v. Johnson*, 286 F.3d 1080, 1087 (9th Cir. 2002) (denying petitioner's request for

20   evidentiary hearing regarding his assertion of actual innocence); *Griffey*, 345 F.3d at 1067

21   (even where petitioner had shown diligence entitling him to evidentiary hearing, Ninth

22   Circuit concluded that petitioner was not entitled to evidentiary hearing because his claims

23   could be resolved by reference to the state court record and the documentary evidence he

24   submitted). Given that this is the case, and given this court's consideration of AEDPA's

25   deferential standard enunciated by § 2254(d), the court DENIES Aguro's request for an

26   evidentiary hearing.

27   *////*

28

**United States District Court**
For the Northern District of California

1

**CONCLUSION**

2        For the reasons set forth above, Aguro's petition for writ of habeas corpus is

3   DENIED because the state courts' decisions were neither contrary to, nor an unreasonable

4   application of, clearly established federal law; nor were they based on an unreasonable

5   determination of the facts in light of the evidence presented.  This order fully adjudicates

6   this case and terminates all pending motions.  The clerk shall close the file.

7   **IT IS SO ORDERED.**

8

9

10  Dated: April 22, 2008

11

12                                          _____

13                                          PHYLLIS J. HAMILTON
                                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28